1  Anthony J. Dain (Bar No. 98947)
2  Frederick K. Taylor (Bar No. 159838)
   Heather A. Cameron (Bar No. 265310)
3  PROCOPIO, CORY, HARGREAVES
   & SAVITCH LLP
4  525 B Street, Suite 2200
5  San Diego, California 92101
   Telephone: (619) 238-1900
6  Facsimile: (619) 235-0398
7
8  (*pro hac vice applications to be filed*)
   Frank V. Langfitt III (Or. No. 731770)
9  Heidee Stoller (Or. No. 072835)
   Jeffrey M. Peterson (Or. No. 115723)
10 ATER WYNNE LLP
11 1331 NW Lovejoy Street, Suite 900
   Portland, Oregon 97209
12 Telephone: (503) 226-1191
13 Facsimile: (503) 226-0079
14
15            **IN THE UNITED STATES DISTRICT COURT**
16           **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**
17
18 FEDERAL DEPOSIT INSURANCE          CASE NO. : '13CV0351 GPC WMC
   CORPORATION as Receiver for
19 LA JOLLA BANK, FSB,
20            Plaintiff,              **COMPLAINT**
21     v.                            [PLAINTIFF DEMANDS JURY
                                     TRIAL PURSUANT TO FEDERAL
22 RICHARD K. COLBOURNE, RICK F.     RULE OF CIVIL PROCEDURE 38 and
   HALL, and MARTIN RODRIGUEZ,       CivLR 38.1]
23            Defendants.
24
25        Plaintiff, the Federal Deposit Insurance Corporation as Receiver for La Jolla
26 Bank, FSB ("FDIC-R"), complains and alleges as follows:
27                      **I.    INTRODUCTION**
28        1.    The FDIC-R seeks to recover damages in excess of $57 million

                                    1

resulting from the negligence, gross negligence, and breaches of fiduciary duty by former La Jolla Bank, FSB ("LJB" or "Bank") officers Rick F. Hall ("Hall")[1] and Martin Rodriguez ("Rodriguez") and former LJB director Richard K. Colbourne ("Colbourne") (collectively, "Defendants").

2.     Defendants' acts and omissions violated LJB's loan policy (the "Loan Policy") and prudent, safe, and sound lending practices, and included, among other things, recommending or approving speculative commercial real estate loans despite known adverse economic conditions in the local real estate market; recommending or approving credit to borrowers who were not creditworthy or were known to be in financial difficulty; recommending or approving loans without conducting or insisting upon sufficient underwriting; recommending or approving credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing cash flow and other critical financial information; recommending or approving loans without adequate appraisals; recommending or approving loans that violated the Bank's limit on loans-to-any-one-borrower ("LTAOB"); and recommending or approving loans with excessive loan-to-value ("LTV") ratios.

3.     As an LJB officer, Hall breached his fiduciary duties and was negligent and grossly negligent by, among other things, approving at least seven loans between March 2007 and March 2009 (the "Loans") in violation of LJB's Loan Policy and prudent, safe, and sound lending practices.

4.     As an LJB officer, Rodriguez breached his fiduciary duties and was negligent and grossly negligent by, among other things, recommending at least six of the Loans in violation of LJB's Loan Policy and prudent, safe, and sound lending practices.

5.     As an LJB director, Colbourne breached his fiduciary duties and was grossly negligent by, among other things, approving at least five of the Loans in

---

[1] Hall was also a director of the Bank, but the FDIC-R is suing him in his capacity as a former officer of LJB.

violation of LJB's Loan Policy and prudent, safe, and sound lending practices.

6.     Hall and Rodriguez are liable for the damages they caused the Bank as a result of their negligence, gross negligence, and breaches of fiduciary duties.

7.     Colbourne is liable for the damages he caused the Bank as a result of his gross negligence and breaches of fiduciary duties.

## II.     THE PARTIES

### A.     Plaintiff

8.     The Federal Deposit Insurance Corporation ("FDIC") is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1831aa, with its principal place of business in Washington, D.C.  12 U.S.C. §§ 1811(a), 1813(z).  Among other duties, the FDIC, as receiver, is charged with the orderly liquidation of failed banks.  12 U.S.C. § 1821(c)(2)(A)(ii).

9.     On February 19, 2010, the Bank was closed by the Office of Thrift Supervision ("OTS"), and the FDIC-R was appointed as receiver.  At that time, the FDIC-R succeeded to all rights, titles, and privileges of the Bank and its depositors, account holders, and stockholders.  12 U.S.C. § 1821(d)(2)(A)(i).

### B.     Defendants

10.     Colbourne was Chairman of the LJB Board of Directors from 1983 to the Bank's closure.  Colbourne also served as a member of the Bank's Executive Loan Committee ("ELC") at all material times.

11.     Hall was President and Chief Executive Officer ("CEO") from June 3, 1996 until January 7, 2010.  Hall also served on the ELC at all material times.  At all material times, Hall oversaw the day-to-day operations of the Bank.

12.     Rodriguez was a Quality Control Loan Funder from January 10, 1993 until January 28, 1998, when he was promoted to Assistant Vice President ("AVP") of Loan Operations.  Rodriguez was promoted to Vice President ("VP") of Loan Operations on May 31, 2000, and to VP and Chief Credit Officer ("CCO") on

COMPLAINT

June 3, 2008, a position Rodriguez held until December 8, 2009.  As VP of Loan Operations and as CCO, Rodriguez was charged with initiating and maintaining the quality, safety, and soundness of the Bank's credit portfolio.

### III.   JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this case pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

14.    This Court has personal jurisdiction over Defendants, who at all relevant times were residents of, and conducted the business of the Bank, in the State of California.

15.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial portion of the events and/or omissions giving rise to the claims and damages asserted herein occurred in this District.

### IV.   THE BANK'S LENDING FUNCTION AND LOAN PORTFOLIO

16.    Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability and one of the most critical aspects of loan portfolio management.  Loan underwriting standards define a bank's desired level of creditworthiness for borrowers and guarantors and provide uniform criteria for evaluating loans.  Loan underwriting standards are also important in protecting bank capital, which can erode from imprudent, unsafe, or unsound lending practices.

17.    Underwriting practices (which are described in Parts 364 and 365 of the FDIC Rules and Regulations) are characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.   Underwriting practices also encompass the management and administration of the loan portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies, and adherence to written

4
COMPLAINT

underwriting policies.

18.     Commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans are known to be more speculative than other types of loans because of, among other reasons, the lack of a present cash flow source, uncertainties of development and sale, and the need for adequate secondary sources of repayment.   Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends affecting the industry, and strict adherence to prudent lending policies and standards.   Moreover, concentrating a loan portfolio in CRE/ADC loans increases a bank's risk for numerous reasons, including: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/ADC concentrations.   In short, a bank's loan committee members and credit officers must vigilantly adhere to their bank's loan policies and prudent, safe, and sound lending practices when recommending or approving CRE or ADC loans because these loans are inherently riskier.

19.     Regulatory agencies periodically reminded financial institutions of the risks involved in CRE/ADC lending.   On October 8, 1998, the FDIC issued Financial Institution Letter 110-98, which warned financial institutions of the risk inherent in ADC lending in a favorable real estate market, including an oversupply of developed property.   Among other things, FIL 110-98 stated that "ADC lending is a highly specialized field with inherent risks that must be managed and controlled to ensure that this activity remains profitable."

20.     Similarly, on December 12, 2006, the Office of the Comptroller of the Currency ("OCC"), FDIC, and Board of Governors of the Federal Reserve System jointly issued "Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices," which specifically warned banks that "[c]oncentrations of

COMPLAINT

credit exposure add a dimension of risk that compound the risk inherent in individual loans."

## V.     FACTS

### A.     History of LJB

21.     Frank Warren ("Warren") founded LJB on December 5, 1985, as La Jolla Village Savings Bank, a state-chartered bank in La Jolla, California. The Bank was wholly owned by a bank holding company, La Jolla Bancorp ("Bancorp"), which is in turn owned by five Warren family trusts. On July 1, 1992, LJB became a federal stock savings bank and changed its name to La Jolla Bank, FSB. At the time of the Bank's closing, it operated nine branches in California and one branch in Texas. The Bank also had four loan production centers—two in California, one in New York, and one in Arizona.

22.     The Warren family trusts are also owners of Warren Properties, Inc. ("Warren Properties"), which manages commercial and residential properties in 15 states and is headquartered in Escondido, California. Hall, along with being President of the Bank, was president of Warren Properties.

23.     In 2003, Hall assumed control of the Bank and its operations. Hall's compensation consisted of a guaranteed annual base salary of $500,000 and an incentive bonus based on the Bank's adjusted pre-tax income. With this financial incentive, Hall rapidly increased the Bank's high-risk loan portfolio to boost profits despite violations of the Bank's policies, underwriting requirements, and prudent, safe, and sound lending practices.

24.     The Bank's total loans grew from $1.3 billion in 2003 to over $2.9 billion in 2008—an increase of 223 percent—with a large expansion in CRE and ADC loans. In 2001, ADC loans equaled 53 percent of Tier 1 capital. By 2008, the Bank's ADC loan concentration had nearly tripled to 153 percent of Tier 1 capital. Coinciding with the Bank's increasing concentration in CRE and ADC loans, Defendants knew or should have known of the impending real estate market decline

6

and the associated risks that decline posed for the Bank's loan portfolio.  Board packets for the December 28, 2004 Board of Directors meeting, which Colbourne and Hall received, contained an Allowance for Loan Losses report dated September 30, 2004 (the "ALL Report").  The ALL Report contained the following conclusion as to the state of real estate market conditions: "Increasing housing prices have international roots like the tech boom of the 90's and will have the same boom bust result.  This is a bubble in its early stages and will end badly."  Rodriguez received a copy of the report via email on January 14, 2005.  Rather than take steps to mitigate the Bank's exposure to the impending market bust, Defendants approved or recommended loans with clear deficiencies and increased the Bank's concentration in CRE and ADC lending.

25.     As a result of the rapid loan growth, in 2004 Hall received a $1,611,574 million bonus.  In 2008, his salary increased to $1 million annually.  Between 2006 and 2008, Hall earned $10.3 million, almost seven times more than the next highest paid officer at the Bank.

26.     In 2005, Hall's control of the Bank was solidified when he was appointed to the three-person ELC and given individual loan approval authority of up to $10 million.  In practice, Hall routinely gave oral approval of loans over the telephone.  Hall's oral approval is reflected in loan files by the notation "Verbal RFH."

27.     Hall gave preferential treatment to certain borrowers, whom Bank employees referred to as "Friends of the Bank" or "FOBs."  Rodriguez, whose compensation was also tied to loan production, assisted Hall.  Hall and Rodriguez pressured underwriters into recommending loans for approval, especially loans to Friends of the Bank.  Bank underwriters prepared credit memoranda (when singular, "Credit Memorandum," and when plural, "Credit Memoranda") that recommended FOB loans, but they often refused to initial the Credit Memoranda because they believed the loans were imprudent or that borrower or guarantor

information was unverified.  Bank underwriters also prepared Credit Memoranda for some FOB loans after the ELC had already approved the loan.

28.    On January 13, 2006, Jim Masonbrink ("Masonbrink"), who was then the manager of the Bank's Internal Asset Review ("IAR") department, sent an email to Lynn Hein ("Hein"), the Bank's Chief Financial Officer, complaining of numerous questionable loan practices that he had witnessed in just one day. Masonbrink warned: "If you do not get some controls and a governor . . . the car will run in the ditch!  Times Change and this Bank has Certainly Changed!" Rodriguez acknowledged the Bank's underwriting failures in an email dated September 18, 2008, stating: "I don't think I need to remind you that all of these issues with the Mortgage Giants are pushing us into the stone age, as it relates to underwriting.  I explained this to you the last time we talked, the days of Fico [sic] Scoring, LTVing, States Assets BS is long gone.  We have to once again underwrite, verify, justify, confirm and ascertain everything presented in a loan request.  That is the only way we are doing business (notice we are one of a handful of banks still lending)."

29.    In addition to pressuring Bank personnel to recommend loans to Friends of the Bank with little or no underwriting, Hall and Rodriguez used their ability to dominate Bank operations to conceal troubled FOB loans, prevent loss recognition on FOB loans, and maintain loan production.  They also made new loans to existing borrowers to refinance or to fund the interest payments on those borrowers' troubled loans.

30.    The Bank maintained its IAR department for the purpose of continuously reviewing asset quality and the adequacy of the Bank's allowance for loan and lease losses ("ALLL").  The IAR function was supposed to be the Bank's early warning system for troubled assets, which included identifying, classifying, and reporting loans with potential and actual credit weaknesses so that the Bank could take timely action to minimize losses, including providing additional scrutiny

to new credit to borrowers or guarantors associated with adversely classified loans. Masonbrink abruptly retired as the IAR manager in June 2006. Instead of hiring a qualified person to take on the role of IAR manager, the Bank hired 22-year-old Nancy Dong ("Dong"), Masonbrink's former assistant, as the "Interim" IAR manager. Dong was a former bank teller who had a high school education and no asset review experience when she was promoted to Interim IAR manager. Notwithstanding the "Interim" title, Dong served as IAR manager for three years, until the second quarter of 2009. By her own admission, Dong was not qualified to be the IAR manager, nor did she have any qualified assistants.

31. According to Bank policy, Dong was to report to the Audit Committee of the Bank's Board of Directors and an IAR Committee, which, according to Bank policy, was to be composed of individuals who did not have approval authority over the loans they reviewed. This did not occur. Instead, Dong was supervised by an informal "Ad Hoc" IAR Committee, which was composed of Hall, Rodriguez, and other senior managers. Colbourne was aware of the Ad Hoc IAR Committee by no later than July 31, 2008. The Ad Hoc IAR Committee, including Hall and Rodriguez, discredited Dong as young and inexperienced. Hall and Rodriguez, through the Ad Hoc IAR Committee, did not allow Dong the independence to manage IAR functions or make classification decisions as to FOBs, pressured and fought Dong to delay classification of troubled loans to FOBs, and defended borrowers that were FOBs.

32. Due to its poor credit administration and malfunctioning IAR process, the Bank failed to timely classify assets. As a consequence, the Bank's 2008 financial statements materially misstated its ALLL and, by extension, its net income by $22 million. In 2009, LJB's independent auditor, Grant Thornton LLP ("Grant Thornton"), reported that the Bank "did not maintain effective internal control over the financial reporting for the accounting for the allowance for loan losses" and that this constituted a "material weakness" in the Bank's controls. In

September 2009, an independent review by auditor Squar, Milner, Peterson, Miranda & Williamson, LLP ("Squar Milner") concluded that, as of September 30, 2009, loan loss reserves were underfunded by at least $180 million.  By the end of 2009, Squar Milner recommended that the Bank needed an additional $308 million in loss reserves.

33.     By late 2009, Chairman of the Audit Committee of the Board of Directors, Kenneth Bien ("Bien"), had "lost confidence" in Hall and Rodriguez. Bien concluded in notes from a conversation with Colbourne on November 13, 2009 that, among other things: "[Hall and Rodriguez] made [line of credit] increases, modifications and have 'hidden' the status of the financial condition of key borrowers . . . .  [T]his management team is unable to objectively resolve the majority of distressed loans as they made these loans, have a close relationship with the borrowers and have made modifications to [lines of credit] that are detrimental to the financial stability of the Bank. . . .  [T]he financial aspects of the Bank will continue to deteriorate until these 2 are replaced."

34.     The Bank was unable to raise sufficient capital to remedy its liquidity problems, and it failed on February 19, 2010.

**B.     Regulatory History**

35.     LJB was subject to the supervision of the OTS, which conducted regular examinations of the Bank and provided a Report of Examination ("RoE") at the conclusion of each examination.

36.     The May 3, 2004, RoE criticized the Bank's IAR function, finding it "less than fully effective."   Among other things, the RoE observed that the IAR department did not review construction loans, renewable business loans, or land loans, even though these high-risk loans were a rapidly increasing percentage of the Bank's assets.  The OTS directed the Bank to increase IAR resources and to expand the scope of IAR review.

37.     The July 25, 2005, RoE warned that the Bank's asset quality was "less

than satisfactory" and "identified a number of credit administration weaknesses, including an [IAR] system that needs to be enhanced."  The OTS warned that "the IAR policies and procedures should establish specific performance criteria and periods that adequately support the rationale for declassifying an asset.

38.     The July 31, 2006, RoE concluded that underwriting and monitoring of commercial loans "did not include adequate analysis and documentation of cash flows and liquid resources to be used to ensure repayment of the loans."  The OTS warned again that review of commercial loans needed to be expanded and needed to occur more frequently.

39.     In the September 10, 2007, RoE examiners again criticized IAR processes and noted significant failures in connection with larger and more complex relationships, including certain Friends of the Bank.  The December 29, 2008, RoE, which was delivered on March 16, 2009, concluded that the Bank's IAR function had completely failed and that the Bank had not properly classified troubled loans made in prior years or adequately reserved for loan losses.

40.     On September 9, 2009, the OTS issued a Cease and Desist Order to both the Bank and its holding company based on its conclusion that both the Bank and Bancorp had engaged in unsafe and unsound practices.  The OTS closed the Bank on February 19, 2010.

   **C.     LJB's Loan Policy**

41.     LJB's directors established the Loan Policy, which is dated July 27, 2006 and was amended from time to time thereafter.  The Loan Policy set forth the specific requirements for underwriting and loan approvals.

42.     The Loan Policy established loan approval processes and authorities.  Underwriters were required to submit Credit Memoranda, which included their analyses and recommendations, for review to the VP of Loan Operations, who was Rodriguez during the relevant time period.  The VP of Loan Operations (Rodriguez) then submitted and recommended the loan to the delegated authority

11

COMPLAINT

for approval.   Loan approval authorities were based on the total amount of the proposed loan at the time of approval and were as follows: Any two members of the ELC constituted a quorum, but any one member had loan approval authority up to $10 million.   Loans in excess of $10 million up to the Bank's legal lending limit required the approval of two ELC members.

43.    The Loan Policy contained extensive provisions regarding the underwriting of various types of loans, including but not limited to real estate loans and construction loans.   Defendants recommended or approved the Loans, which violated numerous provisions of the Loan Policy, including but not limited to the following:

a.    Objective and reliable financial statements of borrowers and guarantors, including credit reports and two years of tax returns, were to be obtained.

b.    Every proposed loan required a Credit Memorandum in which the underwriter was required to analyze borrower and guarantor creditworthiness, including liquidity, cash flow, credit history, character, motivation, and desire to repay the loan, and project collateral.   Credit Memoranda were accompanied by a Commercial Financial Analysis or Underwriting Analysis.   Underwriters recommended a loan and ELC members approved a loan by initialing or signing either the Commercial Financial Analysis or the Underwriting Analysis.

c.    The loan was required to have a documented secondary source of repayment.   The Bank was also to be sensitive to changing market conditions.

d.    Underwriters were required to thoroughly review appraisals to determine completeness, reasonableness, and other items.

e.    The maximum loans-to-any-one-borrower, LTAOB, limit was

DOCS 108883-000000/1685554.3

15 percent of the Bank's capital.

      f.     LTV ratio limits were 65 percent for raw land loans, 75 percent for acquisition and development loans and loans for developed lots, 80 percent for multifamily unit construction and commercial loans, and 85 percent for nonowner-occupied construction and nonowner-occupied residential loans.

**D.    Loan Underwriting Violations and Deficiencies**

44.    Between March 15, 2007, and March 25, 2009, Defendants recommended or approved numerous loans in violation of the Loan Policy and prudent, safe, and sound underwriting standards by some or all of the following acts or omissions, among others:

      a.     Speculative Lending — Causing or permitting speculative, high-risk loans to be made, many after the economic decline of the real estate market was well known;

      b.     Loans to Non-Creditworthy Borrowers — Causing or permitting loans to be made to borrowers who were uncreditworthy and/or in financial difficulty;

      c.     Loans to Non-Creditworthy Guarantors — Causing or permitting loans to be made with guarantors who were uncreditworthy and/or in financial difficulty;

      d.     Lack of Underwriting Analysis — Causing or permitting loans to be made with no or marginal underwriting analysis;

      e.     Inadequate Appraisals — Causing or permitting loans to be made on the basis of inadequate appraisals;

      f.     LTAOB Violations — Causing or permitting loans to be made that violated LTAOB limitations in the Loan Policy; and

      g.     Excessive LTV Ratios — Causing or permitting the Bank to approve loans with excessive LTV ratios.

DOCS 108883-000000/1685554.3

### E.   **Transactions Causing Damages**

45.     Defendants are liable for the damages that they caused the Bank to suffer.  In this lawsuit, the FDIC-R seeks to collect damages flowing from Hall's and Rodriguez' negligence, gross negligence, and breaches of fiduciary duties and from Colbourne's gross negligence and breaches of fiduciary duties.  The loan transactions set forth below illustrate the very types of failures, breaches, and violations of duty referenced above committed by each of the Defendants, resulting in damages to the Bank.  The FDIC-R seeks compensatory damages and other relief as a result of Defendants' conduct as described below.

*Borrower A[2]*

46.     On or about March 15, 2007, Defendants Colbourne and Hall approved a loan to Borrower A in the amount of $7.5 million (the "Borrower A Loan") by signing the Commercial Financial Analysis.  Hall initially approved the Borrower A Loan orally, as indicated by the notation "Verbal RFH" on the Commercial Financial Analysis.  Defendant Rodriguez recommended the Borrower A Loan for approval by initialing the Commercial Financial Analysis.  One of the guarantors of the Borrower A Loan was Borrower C, who was a lending customer of the Bank on a loan discussed below.  Borrower C was a Friend of the Bank.

47.     The purpose of the Borrower A Loan was to finance the acquisition of two single story commercial buildings and 17,300 square feet of land for the development of luxury condominiums in Rancho Santa Fe, California.

48.     According to the Credit Memorandum, the repayment sources were the "Take out from proposed development loan," "Guarantor income along with [property in question] lease income," and "Sale or liquidation of [property in question]," in that order.

---

[2] Borrowers A, B, C, D, E, F, and G referenced herein represent individual borrowers or limited liability companies that were closely held by individual principals.  The names of these borrowers and LLCs have been withheld to protect the privacy of the individual borrowers and principals, but will be provided once an appropriate protective order is in place.

COMPLAINT

49.     The Borrower A Loan was secured by a first deed of trust on property located in Rancho Santa Fe, California.

50.     In recommending or approving the Borrower A Loan, Colbourne, Hall, and Rodriguez engaged in imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

      a.     The Borrower A Loan was speculative and high risk, relying on the success of the underlying project to repay the loan and was otherwise without a viable repayment source.

      b.     Borrower A was a stand-alone entity created to own the property and therefore had no independent resources to support the debt.

      c.     The guarantor, Borrower C, was heavily involved in the real estate market and susceptible to a market decline.  Further, according to the Credit Memorandum, the guarantor's tax returns showed a loss for the 2005 tax year and limited income for the 2004 tax year.

      d.     Defendant Rodriguez recommended and Defendants Colbourne and Hall approved the Borrower A Loan despite the loan underwriter withholding recommendation of the loan.

      e.     Based upon the above-listed deficiencies, Defendants Colbourne, Hall, and Rodriguez should not have recommended or approved the Borrower A Loan or allowed the Bank to fund the Borrower A Loan, and their acts and omissions have caused damages.

51.     On or about April 1, 2008, Borrower A defaulted on the Borrower A Loan.

52.     Colbourne's, Hall's, and Rodriguez's negligent and/or grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Borrower A Loan caused damages in excess of $6.8 million.  Had Defendants Colbourne, Hall, and Rodriguez performed or insisted upon the required credit analysis and otherwise complied with the Bank's Loan Policy, the Bank would not

COMPLAINT

have made the Borrower A Loan, and the resulting damages would not have occurred.

### Borrower B

53.     On or about April 27, 2007, Defendants Colbourne and Hall approved a loan to Borrower B in the amount of $30.5 million (the "Borrower B Loan") by signing the Underwriting Analysis.  Hall initially approved the Borrower B Loan orally, as indicated by the notation "Verbal RFH" on the Underwriting Analysis. Defendant Rodriguez recommended the Borrower B Loan for approval by initialing the Underwriting Analysis.    The guarantor of the Borrower B Loan was Borrower C, the same Friend of the Bank who guaranteed the Borrower A Loan.

54.     The purpose of the Borrower B Loan was to refinance existing debt on a vacant 10 story office building located in Phoenix, Arizona, as well as to fund demolition of the building.  Borrower B intended to develop 160 townhomes on the project property following demolition.

55.     The repayment sources were take-out financing from a construction lender, sale of guarantor assets, and liquidation of collateral, in that order.

56.     The Borrower B Loan was secured by a first deed of trust on property located in Phoenix, Arizona, including an abundance of caution lien.

57.     In recommending or approving the Borrower B Loan, Colbourne, Hall, and Rodriquez engaged in imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

> a.     The Borrower B Loan was speculative and high risk, relying on the success of the underlying project to repay the loan and was otherwise without a viable repayment source.
>
> b.     Borrower B and the guarantor, Borrower C, were heavily involved in the real estate market and susceptible to a market decline. Further, according to the Credit Memorandum, the guarantor's tax returns showed a loss for the 2005 tax year and limited income for the

2004 tax year.  In addition, the Credit Memorandum contains only marginal underwriting analysis of, among other things, the financial condition of the borrower and guarantor.

c.    Defendant Rodriguez recommended and Defendants Colbourne and Hall approved the Borrower B Loan despite the loan underwriter withholding recommendation of the loan.

d.    Based upon the above-listed deficiencies, Defendants Colbourne, Hall, and Rodriguez should not have recommended or approved the Borrower B Loan or allowed the Bank to fund the Borrower B Loan, and their acts and omissions have caused damages.

58.    On or about April 1, 2008, Borrower B defaulted on the Borrower B Loan.

59.    Colbourne's, Hall's, and Rodriguez's negligent and/or grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Borrower B Loan caused damages in excess of $29.6 million.  Had Defendants Colbourne, Hall, and Rodriguez performed or insisted upon the required credit analysis and otherwise complied with the Bank's Loan Policy, the Bank would not have made the Borrower B Loan, and the resulting damages would not have occurred.

### Borrower C

60.    On or about December 11, 2008, Defendant Hall approved a loan to Borrower C in the amount of $5 million (the "Borrower C Loan") by signing the Underwriting Analysis.  Hall initially approved the Borrower C Loan orally, as indicated by the notation "Verbal RFH" on the Underwriting Analysis.  Defendant Rodriguez recommended the Borrower C Loan for approval by initialing the Underwriting Analysis.  Borrower C was a Friend of the Bank, and he guaranteed the Borrower A and B Loans.

61.    The Borrower C Loan was a line of credit for the purpose of funding

home improvements for Borrower C.

62.     The repayment sources were to be refinancing or sale of the project property and sale of collateral, in that order.

63.     The Borrower C Loan was secured by deeds of trust on three properties, two located in Coronado, California, and one located in Rancho Santa Fe, California.

64.     In recommending or approving the Borrower C Loan, Hall and Rodriguez engaged in imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

> a.     The Borrower C Loan was speculative and high risk, relying on the success of Borrower C's real estate projects to repay the loan and was otherwise without a viable repayment source.

> b.     Borrower C was heavily involved in the real estate market and susceptible to a market decline.  In addition, underwriting of cash flow and other financial attributes was marginal.

> c.     Defendant Rodriguez recommended and Defendant Hall approved the Borrower C Loan despite the loan underwriter withholding recommendation of the loan.

> d.     Based upon the above-listed deficiencies, Defendants Hall and Rodriguez should not have recommended or approved the Borrower C Loan or allowed the Bank to fund the Borrower C Loan, and their acts and omissions have caused damages.

65.     Borrower C defaulted on the Borrower C Loan after the Bank's closure.

66.     Hall's and Rodriguez's negligent and/or grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Borrower C Loan caused damages in excess of $4.9 million.  Had Defendants Hall and Rodriguez performed or insisted upon the required credit analysis and otherwise complied with

18

the Bank's Loan Policy, the Bank would not have made the Borrower C Loan, and the resulting damages would not have occurred.

### Borrower D

67.     On or about June 8, 2007, Defendants Colbourne and Hall approved a loan to Borrower D in the amount of $7.537 million (the "Borrower D Loan") by signing the Underwriting Analysis.   Defendant Rodriguez recommended the Borrower D Loan for approval by initialing the Underwriting Analysis.  Borrower D was a Friend of the Bank.

68.     The purpose of the Borrower D Loan as described in the Credit Memorandum was to fund the acquisition of property located in Anza, California, pay for mapping costs, and establish an interest reserve.  A settlement statement for the Borrower D Loan showed that the true purpose was to pay unrelated expenses, make payments on other delinquent loans involving Borrower D, and pay off earlier loans of Borrower D.

69.     According to the Credit Memorandum, the repayment sources were the "Sale of [the property in question] / Take-out Construction Loan" and "Liquidation of Guarantor Assets," in that order.

70.     The Borrower D Loan was secured by a first deed of trust on property located in Anza, California.

71.     In recommending or approving the Borrower D Loan, Colbourne, Hall, and Rodriguez engaged in imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

> a.     The Borrower D Loan was speculative and high risk, relying on the success of Borrower D and the guarantor's real estate projects to repay the loan and was otherwise without a viable repayment source.

> b.     Borrower D and the guarantor were heavily involved in the real estate market and susceptible to a market decline, were delinquent on other loans to the Bank, and had marginal liquidity.  The guarantor's

19

tax returns also showed a loss for the 2005 tax year.

c.   The appraisal supporting the Borrower D Loan was flawed in several particulars, including its selection of comparable sales and improper aggregation of individual property values.

d.   The stated LTV ratio of 55 percent was based on the improper aggregate of individual lot values.

e.   Defendant Rodriguez recommended and Defendants Colbourne and Hall approved the Borrower D Loan despite the loan underwriter withholding recommendation of the loan.

f.   Based upon the above-listed deficiencies, Defendants Colbourne, Hall, and Rodriguez should not have recommended or approved the Borrower D Loan or allowed the Bank to fund the Borrower D Loan, and their acts and omissions have caused damages.

72.   On or about January 1, 2009, Borrower D defaulted on the Borrower D Loan.

73.   Colbourne's, Hall's, and Rodriguez's negligent and/or grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Borrower D Loan caused damages in excess of $4.1 million.  Had Defendants Colbourne, Hall, and Rodriguez performed or insisted upon the required credit analysis and otherwise complied with the Bank's Loan Policy, the Bank would not have made the Borrower D Loan, and the resulting damages would not have occurred.

**Borrower E**

74.   On or about November 20, 2007, Defendants Colbourne and Hall approved a loan to Borrower E in the amount of $29.9 million (the "Borrower E Loan") by signing the Underwriting Analysis.  Hall initially approved the Borrower E Loan orally, as indicated by the notation "Verbal RFH" on the Underwriting Analysis.  Defendant Rodriguez recommended the Borrower E Loan for approval

DOCS 108883-000000/1685554.3

by initialing the Underwriting Analysis.  Borrower E was a Friend of the Bank.

75.     The Borrower E Loan was a line of credit for the purpose of purchasing from the Bank three non-performing acquisition and development loans, along with funding working capital to complete development on the projects associated with those loans.  Those projects were located in Escondido, Chino Hills, and Perris, California.

76.     According to the Credit Memorandum, the repayment sources were the "Successful development and sale of land development projects" and "Guarantor assets along with liquidation of collateral properties," in that order.

77.     The Borrower E Loan was secured by three LJB loans and second deeds of trust of three properties, two of which were located in El Centro, California and the third located in Belen, New Mexico.

78.     In recommending or approving the Borrower E Loan, Colbourne, Hall, and Rodriguez engaged in imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

> a.     The Borrower E Loan was speculative and high risk, relying on the success of Borrower E and the guarantor's real estate projects to repay the loan and was otherwise without a viable repayment source.

> b.     Borrower E and the guarantor were heavily involved in the real estate market and susceptible to a market decline.  According to the Credit Memorandum, tax returns for Borrower E showed a loss for the 2005 tax year.  The guarantor's financial statements showed deficient available cash and losses for the 2006 and 2005 tax years.

> c.     The appraisal supporting the loan was flawed in several particulars, including its use of "up market" values.  The appraiser was also retained by Borrower E, not the Bank.

> d.     Defendant Rodriguez recommended and Defendants Colbourne and Hall approved the Borrower E Loan despite the loan underwriter

withholding recommendation of the loan.

    e.    Based upon the above-listed deficiencies, Defendants Colbourne, Hall, and Rodriguez should not have recommended or approved the Borrower E Loan or allowed the Bank to fund the Borrower E Loan, and their acts and omissions have caused damages.

79.    Borrower E defaulted on the Borrower E Loan after the Bank's closure.

80.    Colbourne's, Hall's, and Rodriguez's negligent and/or grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Borrower E Loan caused damages in excess of $7.7 million. Had Defendants Colbourne, Hall, and Rodriguez performed or insisted upon the required credit analysis and otherwise complied with the Bank's Loan Policy, the Bank would not have made the Borrower E Loan, and the resulting damages would not have occurred.

### Borrower F

81.    On or about July 26, 2008, Defendant Hall approved a loan to Borrower F in the amount of $4.2 million (the "Borrower F Loan") by signing the Underwriting Analysis. Hall initially approved the Borrower F Loan orally, as indicated by the notation "Verbal RFH" on the Underwriting Analysis. Defendant Rodriguez recommended the Borrower F Loan for approval by initialing the Underwriting Analysis. Borrower F was a Friend of the Bank.

82.    The Borrower F Loan was a line of credit for the purpose of funding mapping expenses on an unspecified development, as well as to make interest payments on other loans to the Bank.

83.    According to the Underwriting Analysis, the repayment sources were "Sale of the properties in which [the line of credit are] designated to carry" and "Liquidation of borrower/guarantor net worth," in that order.

84.    In recommending or approving the Borrower F Loan, Hall and

COMPLAINT

Rodriguez engaged in imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

    a.    The Borrower F Loan was speculative and high risk, relying on the success of Borrower F and the guarantor's real estate projects to repay the loan and was otherwise without a viable repayment source.

    b.    The Borrower F Loan was unsecured.

    c.    Borrower F and the guarantor were heavily involved in the real estate market and susceptible to a market decline.  Further, according to the Underwriting Analysis, the guarantor's tax returns showed a loss for the 2006 and 2005 tax years.  The guarantor also had marginal liquidity, which largely consisted of loan proceeds from the Bank.

    d.    The Borrower F Loan violated the Bank's LTAOB limit.  At the time Defendants Hall and Rodriguez recommended or approved the Borrower F Loan, the Bank's overall loans to Borrower F and the guarantor amounted to $74.4 million, which exceeded the Bank's LTAOB limit of $52.7 million as of August 18, 2008.

    e.    Defendant Rodriguez recommended and Defendant Hall approved the Borrower F Loan despite the loan underwriter withholding recommendation of the loan.

    f.    Based upon the above-listed deficiencies, Defendants Hall and Rodriguez should not have recommended or approved the Borrower F Loan or allowed the Bank to fund the Borrower F Loan, and their acts and omissions have caused damages.

85.    On or about August 4, 2009, Borrower F defaulted on the Borrower F Loan.

86.    Hall's and Rodriguez's negligent and/or grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Borrower F Loan caused damages in excess of $3.8 million.  Had Defendants Hall and Rodriguez

DOCS 108883-000000/1685554.3

performed or insisted upon the required credit analysis and otherwise complied with the Bank's Loan Policy, the Bank would not have made the Borrower F Loan, and the resulting damages would not have occurred.

### Borrower G

87.     On or about March 25, 2009, Defendants Colbourne and Hall approved a loan to Borrower G in the amount of $5.775 million (the "Borrower G Loan") by signing the Underwriting Analysis.  Hall initially approved the Borrower G Loan orally, as indicated by the notation "Verbal RFH" on the Underwriting Analysis.

88.     The purpose of the Borrower G Loan was to refinance the second home of the guarantor, which was located in Rancho Santa Fe, California, with the cash out proceeds to be used by Borrower G for real estate investments.

89.     According to the Credit Memorandum, the repayment sources were to be "Guarantor Income" and "Sale [of the property in question]," in that order.

90.     The Borrower G Loan was secured by a first deed of trust on property subject to the refinancing.

91.     In approving the Borrower G Loan, Colbourne and Hall engaged in imprudent, unsafe, and unsound lending practices and violated the Loan Policy as evidenced by, among other things, the following:

> a.     The Borrower G Loan was speculative and high risk, relying on the success of Borrower G and the guarantor's real estate projects to repay the loan and was otherwise without a viable repayment source.

> b.     Borrower G and the guarantor were heavily involved in the real estate market and susceptible to a market decline.  The guarantor's stated liquidity was marginal in light of liabilities.  Further, according to the Credit Memorandum, the guarantor's tax returns showed a loss for the 2007 and 2006 tax years.

> c.     Based upon the above-listed deficiencies, Defendants Colbourne

24

COMPLAINT

and Hall should not have approved the Borrower G Loan or allowed the Bank to fund the Borrower G Loan, and their acts and omissions have caused damages.

92.     Borrower G defaulted on the Borrower G Loan after the Bank's closure.

93.     Colbourne's and Hall's negligent and/or grossly negligent actions and inactions and breaches of fiduciary duties with respect to the Borrower G Loan caused damages in excess of $575,000.   Had Defendants Colbourne and Hall performed or insisted upon the required credit analysis and otherwise complied with the Bank's Loan Policy, the Bank would not have made the Borrower G Loan, and the resulting damages would not have occurred.

## CAUSES OF ACTION

### COUNT I

### ORDINARY NEGLIGENCE UNDER CALIFORNIA LAW

94.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-93 above as if fully set out in this count.

95.     Defendants Hall and Rodriguez, as Bank officers, owed LJB a duty of care under California law to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position.  As Bank officers, Defendants Hall and Rodriguez were further obligated to diligently and honestly administer the affairs of the Bank and were under a duty to ensure that the Bank operated in compliance with all applicable rules and policies of the Bank.

96.     Defendant Hall, as CEO and a member of the Bank's ELC, was responsible for the day-to-day management and operation of the Bank and had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business.   These duties included, but were not limited to, preserving the Bank's resources; ensuring that the

DOCS 108883-000000/1685554.3

Bank had adequate policies, procedures, and internal controls relating to, among other things, ADC/CRE and other high-risk lending; ensuring that the Bank adhered to its lending and credit policies, loan approval processes, and loan and credit administration practices; ensuring that the Bank did not make imprudent loans and extensions of credit; and requiring the loans that he approved to comply with the Bank's Loan Policy and prudent, safe, and sound lending practices.  In addition, as a member of the Bank's ELC, Hall was responsible for reviewing Credit Memoranda and approving loans.

97.     Defendant Rodriguez, as CCO, reported to Defendant Hall and was responsible for implementing the Bank's Loan Policy.  Rodriguez had the obligation to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's business.  These duties included, but were not limited to, ensuring that the Bank had adequate loan policies, procedures, and internal controls relating to, among other things, ADC/CRE and other high-risk lending; that the Bank adhered to its policies, procedures, and controls; and that the Bank complied with prudent, safe, and sound lending practices.  As CCO, Rodriguez was responsible for reviewing Credit Memoranda and recommending loans to LJB's ELC.

98.     Defendants Hall and Rodriguez breached their duties to the Bank as described in this Complaint and as follows:

  a.     Defendant Hall, among other things:

    (1)     Failed to ensure that the Bank's lending complied with the Bank's policies and procedures and prudent, safe, and sound lending practices;

    (2)     Approved ADC/CRE and other high-risk loans that violated the Bank's Loan Policy and were imprudent, unsafe, and unsound;

COMPLAINT

(3)    Approved loans that had not been properly underwritten prior to funding;

(4)    Failed to ensure that ADC/CRE and other high-risk loans made by the Bank were prudent, safe, and sound, and that the Bank had a reasonable prospect of being repaid by the debtors;

(5)    Failed to implement and follow sound loan underwriting and credit administration practices;

(6)    Failed to implement prudent risk management strategies by, among other things, allowing dangerous concentrations in ADC/CRE loans;

(7)    Failed to adhere to the Bank's Loan Policy and failed to ensure that Bank personnel followed the Loan Policy; and

(8)    Failed to properly preserve the Bank's resources.

b.    Defendant Rodriguez, among other things:

(1)    Failed to ensure that the Bank's lending complied with the Bank's policies and procedures and prudent, safe, and sound lending practices;

(2)    Recommended ADC/CRE and other high-risk loans that violated the Bank's Loan Policy and were imprudent, unsafe, and unsound;

(3)    Recommended loans that had not been properly underwritten prior to funding;

(4)    Failed to ensure that ADC/CRE and other high-risk loans made by the Bank were prudent, safe, and sound, and that the Bank had a reasonable prospect of being repaid by the debtors;

27

COMPLAINT

(5)  Failed to implement and follow sound loan underwriting and credit administration practices;

(6)  Failed to implement prudent risk management strategies by, among other things, allowing dangerous concentrations in ADC/CRE loans;

(7)  Failed to adhere to the Bank's Loan Policy and failed to ensure that Bank personnel followed the Loan Policy; and

(8)  Failed to properly preserve the Bank's resources.

99.    Hall's and Rodriguez's acts and omissions alleged in this Complaint directly and proximately caused the Bank to suffer millions of dollars in damages, in an amount to be proved at trial.

100.    With respect to their negligent acts and omissions, each Defendant is jointly and severally liable for the damages he caused the Bank to incur.

101.    Defendants Hall and Rodriguez served as officers of the Bank.

102.    Accordingly, Defendants Hall and Rodriguez are not protected by California's Business Judgment Rule, which does not apply to officers or to directors who also served as officers.  In any event, a fundamental requirement of the Business Judgment Rule is the obligation to exercise reasonable diligence, which is an obligation that the Defendants did not meet.

## COUNT II

## GROSS NEGLIGENCE CLAIMS UNDER 12 U.S.C. § 1821(K)

103.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-98 and 101-102 above as if fully set out in this count.

104.    Under the Financial Institutions Reform, Recovery and Enforcement Act, directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.   12 U.S.C. § 1821(k).   California law defines "gross negligence" as the extreme departure from the ordinary standard of conduct.

105.    In the alternative to the Count I negligence claim in this Complaint, the acts and omissions of Defendants Hall and Rodriguez, particularly those specifically alleged in paragraphs 44-93 and 98, constitute gross negligence under California law, but are especially grossly negligent given the cumulative nature of Hall's and Rodriguez's repeated acts and omissions, the Bank's significant over-concentration in speculative ADC and CRE loans, and the deteriorating local and national real estate market when Hall and Rodriguez committed the acts and omissions alleged in this Complaint.

106.    Defendant Colbourne, as a director and a member of the Bank's ELC, had the obligation to exercise the degree of diligence, care, and skill in a manner that was not an extreme departure from the ordinary standard of conduct in management, oversight, and conduct of the Bank's business.

107.    Defendant Colbourne breached his duties to the Bank as described in this Complaint, and he, among other things:

a.      Failed to ensure that the Bank's lending complied with the Bank's policies and procedures and prudent, safe, and sound lending practices;

b.      Approved ADC/CRE and other high-risk loans that violated the Bank's Loan Policy and were imprudent, unsafe, and unsound;

c.      Approved loans that had not been properly underwritten prior to funding;

d.      Failed to ensure that ADC/CRE and other high-risk loans made by the Bank were prudent, safe, and sound, and that the Bank had a reasonable prospect of being repaid by the debtors;

e.      Failed to implement and follow sound loan underwriting and credit administration practices;

f.      Failed to implement prudent risk management strategies, by, among other things, allowing dangerous concentrations in ADC/CRE

DOCS 108883-000000/1685554.3

loans; and

       g.    Failed to adhere to the Bank's Loan Policy and failed to ensure that Bank personnel followed the Loan Policy.

108.    Defendant Colbourne's acts and omissions, particularly those specifically alleged in paragraphs 44-93 and 107, constitute gross negligence under California law, but are especially grossly negligent given the cumulative nature of Colbourne's repeated acts and omissions, the Bank's significant over-concentration in speculative ADC and CRE loans, and the deteriorating local and national real estate market when Colbourne committed the acts and omissions alleged in this Complaint.

109.    Defendants' acts and omissions alleged in this Complaint directly and proximately caused the Bank to suffer millions of dollars in damages, in an amount to be proved at trial.

110.    With respect to their grossly negligent acts and omissions, each Defendant is jointly and severally liable for the damages he caused the Bank to incur.

## COUNT III

## BREACH OF FIDUCIARY DUTY

111.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1-98, 101-102, and 105-108 above as if fully set out in this count.

112.    Under California law, as officers and/or directors of the Bank, Defendants owed LJB fiduciary duties of loyalty, obedience, due care, and diligence, as well as the duty to act in good faith and in the best interests of the Bank.  Thus, Defendants owed a duty to the Bank to adhere diligently and in good faith to the Bank's Loan Policy as well as laws, regulations, and guidelines established to ensure that LJB operated in a safe and sound matter.

113.    In the alternative to Counts I and II in this Complaint, the acts and

COMPLAINT

omissions of each Defendant, described herein and particularly in paragraphs 44-93,98, and 107 of this Complaint, constitute breaches of their fiduciary duties to the Bank.

114.     Defendants' breaches of fiduciary duty alleged in this Complaint directly and proximately caused the Bank to suffer millions of dollars in damages, in an amount to be proved at trial.

115.     With respect to their breaches of fiduciary duty, each Defendant is jointly and severally liable for the damages he caused the Bank to incur.

**[remainder of page intentionally left blank]**

COMPLAINT

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver for La Jolla Bank, FSB, demands a trial by jury and judgment in its favor against Defendants as follows:

1.     For compensatory damages and other damages, jointly and severally, against Defendants for their negligence, gross negligence, and/or breaches of fiduciary duty that resulted in damages;

2.     For prejudgment and other appropriate interest pursuant to 12 U.S.C. § 1821(l) and California law;

3.     Such other and further relief as the Court deems just and proper; and

4.     Plaintiff demands a trial by jury on all issues.


DATED:      February 13, 2013          PROCOPIO, CORY, HARGREAVES &
                                       SAVITCH LLP



                                       By:  /s/ Anthony J. Dain
*(pro hac vice applications*            Anthony J. Dain (Bar No. 98947)
*to be filed)*                          anthony.dain@procopio.com
Frank V. Langfitt III (Or. No.          Frederick K. Taylor (Bar No. 159838)
731770)                                 fred.taylor@procopio.com
fvl@aterwynne.com                       Heather A. Cameron (Bar No.
Heidee Stoller (Or. No. 072835)         265310)
hs@aterwynne.com                        heather.cameron@procopio.com
Jeffrey M. Peterson (Or. No.            525 B Street, Suite 2200
115723)                                 San Diego, California 92101
jmp@aterwynne.com                       Telephone: (619) 238-1900
ATER WYNNE LLP                          Facsimile: (619) 235-0398
1331 NW Lovejoy Street, Suite 900
Portland, Oregon 97209
Telephone: (503) 226-1191               ***Attorneys for Plaintiff***
Facsimile: (503) 226-0079

COMPLAINT

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for LA JOLLA BANK, FSB

**(b)** County of Residence of First Listed Plaintiff    Washington, D.C.

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Anthony J. Dain / Frederick K. Taylor / Heather A. Cameron
Procopio Cory Hargreaves & Savitch LLP
525 B Street, Suite 2200, San Diego CA 92101
(619) 238-1900

## DEFENDANTS

RICHARD K. COLBOURNE, RICK F. HALL and MARTIN RODRIGUEZ

County of Residence of First Listed Defendant    San Diego

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**'13CV0351 GPC WMC**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
     Plaintiff

☐ 2  U.S. Government
     Defendant

☐ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☒ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

☐ 5  Transferred from
     Another District
     *(specify)*

☐ 6  Multidistrict
     Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
12 U.S.C. Section 1821(K); 12 U.S.C. Section 1821(l)

Brief description of cause:
Negligence; Gross Negligence; Breach of Fidiciary Duties

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
2/13/2013

SIGNATURE OF ATTORNEY OF RECORD
*Heather A. Cameron*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____